AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
1/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DTA___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
1/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___JD___ DEPUTY

United States of America

v.

RICARDO ARREOLA,
STEVE LOEZA, and
GREGORY LUIS GUERRERO,

Defendants.

Case No.  8:22-mj-00038-DUTY

**(UNDER SEAL)**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 29, 2019 to March 25, 2020 in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ (b)(1)(A)(viii), (b)(1)(B)(viii) | Distribution of Methamphetamine |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms and Ammunition |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jossue Hernandez*
Complainant's signature

Jossue Hernandez, TFO
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    January 10, 2022

City and state:   Santa Ana, California

*Karen E. Scott*
Judge's signature

Hon. Karen E. Scott, U.S. Magistrate Judge
Printed name and title

AUSA: Jake Nare (213) 393-3549

**A F F I D A V I T**

I, Jossue Hernandez, being duly sworn, hereby declare and
state as follows:

**I.    INTRODUCTION**

1.    I am a Detective with the Anaheim Police Department
("APD") and a federally deputized Task Force Officer ("TFO")
presently working with the Federal Bureau of Investigation
("FBI").  As a TFO with the FBI, I am an investigative or law
enforcement officer of the United States within the meaning of
18 U.S.C. § 2510(7), and I am empowered by law to conduct
investigations and make arrests for offenses enumerated in 18
U.S.C. § 2516.

2.    I am assigned to the Orange County Violent Gang Task
Force ("OCVGTF").  The OCVGTF is composed of federal and local
law enforcement agencies, including, but not limited to, the
FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives,
the APD, the Fullerton Police Department, and detectives from
the Santa Ana Police Department.  The OCVGTF is responsible for,
among other things, investigating violations of federal law
committed by criminal street gangs, the Mexican Mafia, and other
violent criminal organizations in Orange County.  Prior to this
assignment with the FBI, I was an APD police officer and have
been employed as a sworn officer for approximately fourteen
years.

3.    I have specialized training and experience in
investigations of criminal street gangs.  During my tenure as a
police officer, as well as an FBI TFO, I have conducted and

1

participated in numerous investigations of criminal activity, specifically including narcotics trafficking and violent offenses committed by street gangs.  Since joining the OCVGTF in 2020, I have specialized in investigations of the Mexican Mafia and its subordinate gangs in Orange County.  As part of these investigations, I have also learned about the drug trafficking organizations that supply street gangs with illegal narcotics.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of a criminal complaint and arrest warrants for RICARDO ARREOLA ("ARREOLA"), STEVE LOEZA ("LOEZA"), and GREGORY LUIS GUERRERO ("GUERRERO") for violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(viii), Distribution of Methamphetamine, and Title 18, United States Code, Section 922(g)(1), Felon in Possession of Firearms and Ammunition.

5.    The facts set forth in this affidavit are based upon information obtained from other law enforcement personnel, my personal knowledge, and my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    Beginning in July 2019, the OCVGTF began investigating drug and firearm activity within the neighborhood near the intersection of Brownwood Avenue and Valley Street in Anaheim, California (the "Brownwood neighborhood").  As part of the investigation, OCVGTF utilized a Confidential Source ("CS")[1] to conduct controlled purchases of narcotics and firearms during "canvass" operations, in which the CS would walk through the neighborhood and make contact with possible drug and firearm traffickers in an effort to purchase drugs and firearms.

7.    During multiple operations within the Brownwood neighborhood, ARREOLA sold methamphetamine to the CS on four occasions -- including an October 17, 2019 transaction that was aided by LOEZA.  Further, during the investigation, ARREOLA sold firearms to the CS on eight occasions, four of which are described further below.

8.    In addition to the October 17, 2019 sale of methamphetamine to the CS that LOEZA conducted with ARREOLA, during the investigation, LOEZA sold the CS methamphetamine on one other occasion and sold the CS three firearms in three different transactions.  In a January 2, 2020 firearm sale to

---

[1] The CS has worked as a confidential source for several law enforcement agencies over many years for financial remuneration, and has received hundreds of thousands of dollars in compensation for information he provided and for undercover purchases of narcotics and firearms, to include the operations described below.  The CS has two arrests for Driving Under the Influence from the 1990's.  Other than once misidentifying a suspect with whom the CS had limited contact and once mis-describing a vehicle, I am informed that the CS has always provided reliable information, and has been involved in hundreds of individual law enforcement operations.

the CS arranged by LOEZA, GUERRERO arrived and supplied the firearm that LOEZA sold to the CS.  After the CS met GUERRERO during the firearm transaction with LOEZA, GUERRERO sold the CS methamphetamine on two different occasions.

9.    ARREOLA, LOEZA, and GUERRERO are all felons, and therefore prohibited from possessing firearms and ammunition.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

10.   As part of my investigation, I have reviewed investigative reports, body worn camera recordings, and surveillance notes.  I have further spoken with other detectives, special agents, and task force officers regarding the investigation into the Brownwood neighborhood.  Based on this, I have learned the following information.

**A.    The CS Encounters ARREOLA on August 22, 2019**

11.   On August 22, 2019, members of the OCVGTF traveled with the CS to the Brownwood neighborhood in an attempt to make contact with drug dealers to make controlled purchases of narcotics.  Prior to the operation, investigators searched the CS and his vehicle, provided him an audio and video recording device, and gave him money to make the controlled purchase at investigator's direction.[2]  While in the neighborhood, the CS purchased methamphetamine from Brownwood resident, J.B.

---

[2] The intercepted and recorded phone calls referenced herein are based on my review of audio recordings and draft telephone call transcriptions and translations.  The text messages referenced herein are based on my review of the text messages and translations thereof.  Most of the referenced telephone conversations, text messages, and video recordings were
*(footnote cont'd on next page)*

12.   During the transaction, while waiting for J.B. to supply the methamphetamine, the CS spoke to a then unidentified male, later identified as ARREOLA.  During their conversation, ARREOLA identified himself as "Ricardo" and gave the CS the phone number (657) 318-9178 so that the CS could contact him later regarding future drug purchases.

13.   Following the transaction, investigators identified ARREOLA using the name "Ricardo" and a review of law enforcement databases for residents of the Brownwood neighborhood. Investigators then obtained a DMV photograph for ARREOLA and, using the CS's body camera recording, confirmed it was the same individual.

**B.   August 29, 2019 Purchase of Methamphetamine from ARREOLA**

14.   On August 29, 2019, the CS met with OCVGTF in order to conduct an undercover purchase of narcotics in the Brownwood neighborhood.  Prior to the operation, investigators searched the CS and his vehicle for contraband with negative results.[3] Investigators also provided the CS a recording device and a transmitter to monitor and record his interactions with ARREOLA.[4] During the briefing, investigators gave the CS five hundred

---

conducted in Spanish, and then translated into English by a bilingual Linguist Analyst.

[3] The CS and his vehicle were searched by investigators before and after each operation described in this affidavit.

[4] The CS wore these devices for each operation described in this affidavit.  Statements made in this affidavit come from investigators review of the recordings of the transactions or the recordings of telephone and text message conversations by the CS, with the assistance of a Spanish language translator when necessary.

dollars in FBI funds for the purpose of purchasing narcotics and or firearms from ARREOLA at investigator's direction.

15.  At approximately 6:00 p.m., the CS called ARREOLA at the number 657-318-9178, which ARREOLA provided when they met on August 22, 2019.  During the call, the CS asked for an ounce of methamphetamine.  ARREOLA agreed to meet at the Vallarta Supermarket located at 2394 West Lincoln Avenue, Anaheim, California.  The CS traveled to the market, and approximately twenty minutes later, ARREOLA arrived in the parking lot driving a tan PT Cruiser.  The CS entered ARREOLA's vehicle. Once inside, ARREOLA and the CS had a brief conversation about ARREOLA wanting to meet outside the Brownwood neighborhood. ARREOLA and the CS agreed that ARREOLA would sell the CS an ounce of methamphetamine for $200.  The CS paid ARREOLA $200 of FBI funds and ARREOLA handed the CS a clear plastic bag containing an off-white crystalline substance that appeared to be methamphetamine.  The CS asked ARREOLA what else ARREOLA could provide and they talked about firearms.  ARREOLA told the CS he could put him in contact with others who had firearms for sale or who built AR rifles.

16.  After ARREOLA and the CS concluded their meeting, the CS drove to a predetermined meet location and turned in the suspected methamphetamine to investigators.  The substance ARREEOLA sold to the CS was later tested by the DEA Southwest Laboratory and determined to be 27.2 grams of actual methamphetamine.

C.      **October 10, 2019 Purchase of Methamphetamine from ARREOLA**
        **and LOEZA**

17.     On October 9, 2019, the CS and ARREOLA spoke on the
phone, and ARREOLA agreed to sell the CS two ounces of
methamphetamine.  During the call, ARREOLA told the CS that he
wanted to talk about future gun transactions but did not want to
go into details about the firearms over the phone.  They agreed
to meet the following day.

18.     On October 10, 2019, the CS met with OCVGTF
investigators to conduct an undercover purchase from ARREOLA.
Investigators searched the CS and his vehicle with negative
results and provided the CS with an audio and video recording
device to record the transaction.  During the briefing, the CS
was given five hundred dollars in FBI funds for the purpose of
purchasing narcotics and firearms from suspects at
investigator's direction.

19.     Following the briefing, at approximately 6:00 p.m.,
the CS drove and parked at the Calimex Market & Liquor store
located at 318 N. Brookhurst Street, Anaheim, California, which
is within the Brownwood neighborhood.  The CS parked and walked
from the liquor store and onto Brownwood Avenue where he was
contacted by a then unidentified male, later determined to be
LOEZA, who introduced himself to the CS as "Whooper" from
"Brownwood."  LOEZA and the CS spoke for a moment and the CS
told LOEZA that he was looking for an "ounce" and had one
hundred and eighty dollars.  LOEZA told the CS he could get it
for the CS.  The CS and LOEZA walked to the carport area at 2153

West Brownwood Avenue, Anaheim, California and LOEZA left.  A few minutes later, LOEZA returned and gave the CS a torn plastic bag containing what appeared to be methamphetamine in exchange for $180.  At the conclusion of the deal, LOEZA and the CS exchanged phone numbers, and LOEZA provided the CS his phone number, 714-561-7704.

20.  The CS then drove to a predetermined meeting location and OCVGTF Investigator K. Avila and I collected the torn plastic bag containing the off-white crystalline substance resembling methamphetamine.[5]

21.  Following the transaction, TFO Valdez reviewed body worn camera footage of the transaction and identified LOEZA as the seller of the methamphetamine.  From his experience as an APD Detective, TFO Valdez was familiar with LOEZA and knew him to go by the moniker "Whooper."

22.  After the transaction with LOEZA, the CS retained $320 and investigators searched the CS and his vehicle again in preparation for a controlled purchase from ARREOLA later that same night, October 10, 2019.  The CS called ARREOLA and asked if he could "get one" ounce of methamphetamine.  ARREOLA and the CS agree to meet at the Calimex Liquor store in the Brownwood neighborhood.

---

[5] The following day, on October 11, 2019, the CS called me and stated that he found a white rock-like substance resembling methamphetamine inside his pants pocket that came from the torn bag he purchased from LOEZA.  On the same date, October 11, 2019, APD Sergeant Ryan Blackburn contacted the CS and retrieve the purported methamphetamine for evidence.

23.   The CS traveled to the liquor store and called ARREOLA upon arrival.   ARREOLA arrived shortly after and entered the CS's vehicle.   Once inside ARREOLA gave the CS a clear plastic baggie containing two large rock like substances that appeared to be methamphetamine.   After a brief discussion about a possible firearm transaction, ARREOLA left and the CS returned to the debriefing location and handed the methamphetamine purchased from ARREOLA to TFO Valdez, along with the remaining money.

24.   The methamphetamine from the controlled purchases with LOEZA and ARREOLA was later tested by the DEA Southwest Laboratory.   The methamphetamine purchased from LOEZA was determined to be 24.26 grams of actual methamphetamine and the methamphetamine purchased from ARREOLA was determined to be 28.1 grams of actual methamphetamine.

D.   **October 17, 2019 Purchase of Drugs and a Gun from LOEZA and ARREOLA**

25.   On October 13, 2019 and October 16, 2019, the CS and LOEZA had multiple phone calls during which LOEZA and the CS discussed the sale of firearms.   During an October 16, 2019 call, LOEZA told the CS that a "32" was available for "450" and a "357" that was a "Smith and Wesson, all chrome" was available for "500."   Based on my training and experience and knowledge of the investigation, during this call I believe that LOEZA offered to sell the CS a 32mm caliber pistol for $450 and a .357 caliber Smith and Wesson handgun for $500.   The CS asked if he could buy the firearms the next day and LOEZA said yes.   The CS also said

9

he wanted to buy some "product," referring to methamphetamine, and LOEZA confirmed he could provide the methamphetamine.

26.  On October 17, 2019, the CS called LOEZA before the deal and LOEZA said he only had the 32mm handgun and he wanted "550."  The CS asked why it was now "550" instead of the $450 they agreed upon the day prior and LOEZA said the "she is clean, she is small" and "not burnt," referring to the firearm.  Based on my training and experience, I know that weapons that are not stolen or used during criminal activity are often referred to as "clean" and "not burnt."  The CS agreed to buy the gun and asked for "3 of the ounces" of methamphetamine.  LOEZA told him to meet him at a park in the Brownwood neighborhood.

27.  On October 17, 2019 at approximately 5:15 p.m., the CS met with OCVGTF investigators to make the controlled purchase from LOEZA.  The CS was given money for the purchases and given recording devices and a transmitter to monitor and record his interactions with LOEZA.  During the briefing, I searched the CS and his vehicle for contraband with negative results.

28.  The CS again parked at the Calimex Market & Liquor parking lot and walked to LOEZA' residence at 2153 W. Brownwood Avenue, where he greeted LOEZA in the carport area.  LOEZA questioned the CS as to how he knew an individual named J.I., who sold the CS narcotics in the Brownwood neighborhood in prior OCVGTF operations.  The CS explained he knew J.I. for a while and J.I. had introduced the CS to others in Brownwood.  LOEZA appeared satisfied with this explanation and walked in between two parked cars.  There, LOEZA pulled out a silver handgun and

showed it to the CS.  LOEZA removed the magazine clip from the
handgun and placed a single bullet in the magazine.  LOEZA
placed the loaded magazine clip into the handgun and slid the
slide back chambering the bullet into the handgun.  Once LOEZA
demonstrated this to the CS, LOEZA handed the handgun to the CS.
The CS agreed to purchase the handgun and handed it back to
LOEZA.  LOEZA removed and kept the bullet from the handgun.  The
CS pulled out the $1,200 in FBI funds, handed it to LOEZA, and
told him that the money was for the handgun and the narcotics.
The CS asked how much it would be for the three ounces of
methamphetamine and LOEZA responded "180," meaning $180 per
ounce.  The CS handed LOEZA the money for the firearms and
narcotics and LOEZA gave the CS the firearm.  LOEZA told the CS
that he needed to "pick-up" the methamphetamine and that he
would be back in twenty minutes.

29.  TFO R. Valdez and I then met the CS at a predetermined
location where I collected the .32 caliber handgun.  Before
sending the CS back into the neighborhood, I searched the CS and
determined that he had no contraband in his possession.  At
approximately 6:09 p.m., the CS returned to the Brownwood
neighborhood to wait for LOEZA at the "park" within the
Brownwood neighborhood.

30.  At approximately 6:36 p.m., LOEZA arrived and spoke to
the CS.  LOEZA asked the CS if he was in a hurry or if he could
wait because LOEZA's "homie" was bringing the narcotics.  The CS
agreed to wait.  LOEZA told the CS he was calculating three
ounces for one hundred and eighty dollars each for a total of

five hundred and forty dollars for three ounces.  Because the CS provide more money than was necessary for the three ounces, LOEZA agreed to provide him additional methamphetamine.

31.  At approximately 6:43 p.m., ARREOLA, arrived and greeted the CS.  ARREOLA and LOEZA then met away from the CS.  LOEZA returned without ARREOLA and the CS discussed prices again and agreed that it would be $180 an ounce for a total of $540 for three ounces.  The CS asked if "the guy" (referring to ARREOLA) gave him the prices and LOEZA said "yeah."  As they waited, the CS asked LOEZA if ARREOLA was looking around for it and LOEZA said he did not know what "he" (ARREOLA) was doing.

32.  At 7:03 p.m., ARREOLA returned and again met with LOEZA away from the CS.  Approximately two minutes later, LOEZA returned without ARREOLA and handed the CS what he said was 3.4 ounces of what appeared to be methamphetamine.  When handing the drugs to the CS, LOEZA offered to weigh the drugs but the CS said it was unnecessary.  Before leaving, LOEZA pulled out a single bullet from his shorts pocket and gave it to the CS for the weapon he had previously sold him.

33.  Following the transaction, the CS drove to a predetermined meet location where TFO R. Valdez and I collected the .32 caliber bullet and the plastic bag containing the off-white crystalline substance purported to be methamphetamine.

34.  The methamphetamine purchased from LOEZA and ARREOLA was later tested by the DEA Southwest Laboratory and determined to be 86.5 grams of actual methamphetamine.

35.   On December 15, 2020, FBI firearms expert Special Agent Trevor Twitchell examined the firearm and single round of ammunition sold to the CS by LOEZA.  SA Twitchell determined that the firearm was a North American Arms, Model: Guardian, .32 caliber pistol, bearing serial number AA6724, manufactured by American Arms in Utah.  SA Twitchell determined that the round of ammunition was a .32 caliber ammunition stamped "PPU 32 AUTO," manufactured Prvi Partizan internationally.

**E.   October 24, 2019 Firearm Purchase from ARREOLA**

36.   On October 17, 2019, ARREOLA called the CS from a new number (661-441-9302) to let him know that a .357 caliber handgun was available for $400.  During the call, the CS was able to recognize ARREOLA's voice from their prior conversations.  ARREOLA said he would call the CS back to confirm that it was available.  ARREOLA called the CS back shortly after and said that a guy had "2" available, referring to two firearms, and the CS could purchase both firearms for $1,000.  After several phone calls, the CS agreed to meet ARREOLA in the Brownwood neighborhood on Thursday October 24, 2019 to buy the firearms.

37.   On October 24, 2019, after further discussion, the CS agreed to buy a .357 caliber handgun for $500 and a 10mm caliber handgun for $600.  Later, ARREOLA called back to tell the CS that the .357 caliber handgun was not available but that the 10mm caliber handgun was "ready."

38.   OCVGTF investigators met with the CS later on October 24, 2019 to complete the transaction with ARREOLA.

Investigators gave the CS $1,500 in cash to purchase firearms and the CS traveled to the Brownwood neighborhood at approximately 6:10 p.m.

39.   Prior to arriving, ARREOLA called and directed the CS to Catalina Avenue and Valley Street in the Brownwood neighborhood.  The CS walked to the agreed upon location, and ARREOLA arrived shortly after.  ARREOLA directed the CS to a parked unlocked vehicle which they both entered.  Once inside the vehicle, ARREOLA pulled out a handgun and began to inspect it.  ARREOLA told the CS that he originally wanted to keep the gun for himself, but it was a hassle to get bullets for it.  The CS asked how much the firearm cost, and ARREOLA said $600.  The CS paid $600 for the handgun and placed the handgun in a shoebox and left.  The CS then returned to the debriefing location and gave investigators the handgun.

40.   On December 15, 2020, FBI firearms expert SA Trevor Twitchell examined the firearm sold to the CS by ARREOLA.  SA Twitchell determined that the firearm was a Wyoming Arms, Model Parker S.S., 10mm caliber pistol, bearing serial number A08345, manufactured in Wyoming.

**F.   November 5, 2019 Purchase of Firearms from ARREOLA**

41.   On October 31, 2019, ARREOLA called the CS and told him that three firearms were available for sale for "6 bills for each one" ($600 each).  ARREOLA also sent the CS pictures of the three firearms in a box.  The CS told ARREOLA that he was out of town for a few days and could buy them when he returned.

42.  On November 4, 2019, the CS called ARREOLA and asked if the three guns were available.  After making a call, ARREOLA called the CS and said that they were still available for "1500."  ARREOLA and the CS agreed to meet the following day.

43.  The CS met with investigators at approximately 5 p.m. on November 5, 2019 to complete the undercover purchase. Investigators searched the CS and his vehicle with negative results and provided him with $2,900 to buy the firearms and make possible drug purchases at their direction.

44.  The CS entered the Brownwood neighborhood and walked to the corner of Valley Street and Brownwood Avenue.  ARREOLA arrived a few minutes later, carrying a cardboard box.  ARREOLA escorted the CS to a gated courtyard located at 333 North Valley Street.  Once in the courtyard, ARREOLA handed the box to the CS and told him that the three weapons were in the bag along with five magazines and a little bag with bullets.  ARREOLA complained to the CS about suppliers not being reliable and said that he hoped to obtain "three or four" firearms for the CS. The CS then paid ARREOLA $1,500 for the handguns and left.  The CS returned to the debrief location and gave the handguns to investigators.

45.  On December 15, 2020, FBI firearms expert SA Trevor Twitchell examined the firearms and ammunition ARREOLA sold to the CS on November 5, 2019 and determined that the firearms and ammunition consisted of the following:

a.   A Thompson Auto Ordinance Corporation, model 1911 style, 10 mm caliber pistol, bearing serial number A0C32057, manufactured in either Massachusetts, Pennsylvania, or New York;

b.   Star Bonifacio Echeverria, Model Ultra Star 40, .40 caliber pistol, bearing serial number 10373-95, manufactured in Spain;

c.   Star Bonifacio Echeverria, Model Firestar, .40 caliber pistol, bearing serial number 2145024, manufactured in Spain;

d.   Five rounds of .40 caliber ammunition, stamped "Winchester 40 S&W," manufactured by Winchester in either Mississippi or Illinois;" and

e.   Eight rounds of .40 caliber ammunition, stamped "G.F.L. 40 S.W.," manufactured by Fiocchi Munizioni in either Missouri, Idaho, or in Italy.

**G.   November 15, 2019 Purchase of a Firearm from ARREOLA**

46.   On November 12, 2019, ARREOLA contacted the CS and asked him "what do you need?"  The CS asked if any firearms were available and ARREOLA responded that there was one available that cost $550 and was well taken care of it.  The CS told ARREOLA to obtain the firearm and that he would be in the neighborhood the following day.  After several other calls, ARREOLA and the CS agreed to meet for the deal on November 15, 2019.

47.   ARREOLA checked in on the afternoon of November 15, 2019, to confirm that the CS was on his way to the Brownwood

neighborhood to pick up the firearm and confirmed that the price was "550" or $550.

48.  On November 15, 2019, OCVGTF investigators met with the CS and gave him $1,200 to purchase the firearm and to possibly purchase narcotics at investigators' direction. Investigators also searched the CS and his vehicle prior to the transaction and provided him with an audio and video recording device.  At 6:10 p.m., the CS drove to the corner of Brookhurst Street and Catalina Avenue in the Brownwood neighborhood and walked toward the agreed upon spot with ARREOLA.  After about fifteen minutes, ARREOLA called and asked the CS what shirt he was wearing.

49.  The CS ran into LOEZA, who was standing near the entrance of the carport.  The CS told LOEZA that he was looking for ARREOLA to buy a firearm and that ARREOLA was waiting for him in the back of the complex.  LOEZA said he would walk with the CS and they walked together toward 2162 West Brownwood Avenue.

50.  There, an unidentified male, who was referred to as "Paisa," approached and asked the CS if he was sent there on behalf of "Birolo" (ARREOLA).[6]  The CS said he was and asked the unknown male if he "had it," referring to the firearm.  The unknown male walked over to a 4-wheeler ATV and opened a blue backpack near the front pegs of the ATV.  The unknown male removed a plastic bag from the backpack that contained a brown

_____

[6] During the August 22, 2019 encounter with ARREOLA, ARREOLA was referred to as "Birolo" on multiple occasions.

gun case.  The unknown male opened the case, which contained a
9mm caliber handgun, and handed it to the CS.  The CS asked,
"how much is it," and the unknown male said "$550."  Before
leaving, the CS asked the unknown male for his number and the
unknown male told him to get it from "Birolo" (ARREOLA).  The CS
inspected the handgun and then gave the unknown male $560 for
the firearm, two magazines, and some ammunition.

51.  Following the transaction, the CS returned to the
debrief location to meet with investigators.  While driving,
ARREOLA called the CS and asked, "is it done?"  The CS said it
was and asked ARREOLA why he did not show up to the meeting.
ARREOLA stated that he was running errands and confirmed with
the CS that the firearm looked good.

52.  The CS arrived at the debrief location and gave TFO
Valdez the firearm.

53.  On December 15, 2020, FBI firearms expert SA Trevor
Twitchell examined the firearm and ammunition sold to the CS by
ARREOLA and the unknown third party referred to as "Paisa."  SA
Twitchell determined the firearm and ammunition consisted of the
following:

a.  A Star Bonifacio Echeverria, Model Firestar, 9mm
caliber pistol, bearing serial number 2079693, manufactured
internationally;

b.  Five rounds of .38 caliber ammunition, stamped
"Hornady 38 SPL," manufactured by Hornady in either Nebraska,
Mississippi, or Idaho;

      c.    Four rounds of 9mm caliber ammunition stamped "R – P 9 mm LUGER," manufactured by Remington Peters in either Arkansas or Connecticut;

      d.    Three rounds of 9mm caliber ammunition stamped "G.F.L. 9mm LUGER," manufactured by Fiocchi in either Missouri, Idaho, or internationally; and

      e.    One round of 9mm caliber ammunition stamped "WIN. 9mm LUGER," manufactured by Winchester in either Mississippi, Illinois, or internationally.

**H.   December 11, 2019 Purchase of a Firearm from LOEZA**

54.   Throughout November and the beginning of December 2019, the CS and LOEZA spoke about firearm transactions in recorded calls.  On December 10, 2019, the CS called LOEZA and asked about available firearms.  During the call, LOEZA told him "remember the 357 that I have . . .  I have that one in mind right now because I want to get rid of it you know," referring to a .357 caliber handgun.  The CS told LOEZA that he could be in the neighborhood the next evening and LOEZO told the CS he wanted $550 for the gun.

55.   On December 11, 2019, the CS met with investigators to prepare for the operation.  During the meeting, the CS was wired up, searched, and provided $2,500 in funds to purchase firearms and drugs at investigator's direction.

56.   When heading to the Brownwood neighborhood, the CS contacted LOEZA and they agreed to meet at the park in the Brownwood neighborhood, where the CS previously conducted other controlled purchases of drugs and guns throughout this

investigation.  LOEZA told the CS to meet him near the dumpster by the park.

57.  The CS entered the Brownwood neighborhood and walked southbound to the carport of 2162 West Brownwood Avenue, where he previously purchased drugs.  After speaking to several other residents, the CS saw LOEZA who signaled for the CS to follow him into a nearby garage.

58.  Upon entering, LOEZA shut the garage door and pulled out a chrome .357 caliber revolver from his waistband and showed it to the CS.  While pulling the gun out, LOEZA said "just look at this" and then emptied the live rounds from the revolver and handed it to the CS.  LOEZA told the CS that the rounds were .38 caliber and advised the CS to get different caliber rounds for the firearm, stating "these are the thirty-eights you know, you want to get the ones for that one."  The CS then gave LOEZA $550 for the firearm.  Before leaving, LOEZA said he would let the CS know if anything else came up.  LOEZA opened the garage door and the CS walked out.  The CS then left and returned to the debrief location.  The CS handed the firearm and remaining $1,950 in cash to TFO Valdez.

59.  On December 15, 2020, firearms expert, FBI SA Trevor Twitchell examined the firearm LOEZA sold to the CS on December 11, 2019, and determined the firearm was a Weihrauch Sportwaffen, model Armenius HW357, .357 caliber revolver, bearing serial number 1019576, and manufactured internationally.

I.   **JANUARY 2, 2020 Purchase of Guns and Drugs from ARREOLA, LOEZA and GUERRERO**

60.   On December 30, 2019, LOEZA called the CS and they discussed several firearms that were available.  At the end of the call, the CS agreed to meet LOEZA on January 2, 2020 to purchase the firearms.

61.   That same day, ARREOLA called and told the CS that there were three (weapons) available "but they were expensive." The CS told ARREOLA that he would be there later that day and also asked for "three of those baggies" (referring to three ounces of methamphetamine).  ARREOLA told the CS to call him when he arrived and he was thinking "150 each," referring to $150 per ounce of methamphetamine.

62.   After the call with ARREOLA, the CS met with detectives on January 2, 2020 to complete the undercover purchase.  Investigators gave the CS $1,500 to make the purchases and the CS met LOEZA at his apartment, located at 2153 West Brownwood Avenue.  At the time, LOEZA was carrying a crossbow.  LOEZA told the CS he was waiting for a "homie" who was bringing a ".380," referring to a .380 caliber pistol. LOEZA asked the CS where he parked and the CS told him he was parked at the Calimex Market.  LOEZA told the CS that his friend, who was not from the Brownwood neighborhood,  would drive them to the CS's vehicle for the deal.  LOEZA asked if the CS needed "work" and told the CS that his friend had "heroin. . . he's got everything."

63.   At 6:41 p.m., a black Honda Civic, with California license plate 7JGK312, entered the driveway, driven by a female, who was later identified as N.G.  LOEZA approached an unidentified male in the front passenger seat, later identified as Gregory GUERRERO, who exited the vehicle and introduced himself to the CS as "SNAPS."

64.   LOEZA told the CS that it was "going to be 450" and the CS asked, "what is this one, dude?" referring to the firearm.  LOEZA replied "38" and the CS said he thought it was a "nine," meaning a 9mm caliber handgun.  LOEZA replied "well that's why its going to be 450, cause that – remember I told you right now?  My homie did some other shit, bro."  The CS paid GUERRERO $450 and GUERRERO pulled out the firearm from his waistband, unloaded it, and handed the firearm to the CS. GUERRERO offered the CS the ammunition, which the CS took. GUERRERO asked if the CS was interested in "another one" and the CS said he would buy it.  GUERRERO gave the CS his number as 714-357-7482 and again told the CS his name was "SNAPS."

65.   Following the transaction, the CS left and returned to the debriefing area, where he turned in the .38 caliber revolver and ammunition to investigators.  The CS retained the rest of the money for the second operation.

66.   At the time of the transaction with LOEZA and GUERRERO, investigators did not know who GUERRERO was. Investigator V. Do used social media and open sources to eventually locate GUERRERO, who, according to social media, went by "Snaps."  Using a DMV print off for GUERRERO, TFO Valdez

reviewed the CS's body worn camera footage and determined that
it was the same person.  Investigators also showed the CS the
DMV record for GUERRERO and the CS identified him as the
individual who sold the firearm.

67.  On December 15, 2020, FBI firearms expert, SA Trevor
Twitchell examined the firearm and ammunition purchased by the
CS from LOEZA and GUERRERO.  SA Twitchell determined the firearm
to be an Amadeo Rossi, model .38 special, .38 caliber revolver,
bearing serial number AA031481, that was manufactured
internationally.  SA Twitchell determined the ammunition to be
five rounds of .38 caliber ammunition stamped "HORNADY 38 SPL,"
manufactured by Hornady Manufacturing in either Nebraska,
Mississippi, or Idaho.

68.  After purchasing the firearm from LOEZA and GUERRERO,
the CS contacted ARREOLA to confirm the previously arranged
purchase of three ounces of methamphetamine.  ARREOLA said he
needed to obtain the methamphetamine from his "homie" and said,
"let me verify and I'll call you."  ARREOLA called back a few
minutes later and said it would be about 15 minutes for his
"homie" to bring the drugs.  ARREOLA and the CS agreed to meet
at the Vallarta Supermarket parking lot, located at 2394 West
Lincoln Avenue in Anaheim (where the previous August 29, 2019
deal took place).  When the CS arrived, he received a call from
ARREOLA asking where he was.  ARREOLA then walked toward the CS
and got into his vehicle.

69.  Once inside, ARREOLA placed a white Styrofoam cup in
the center cup holder between the driver and passenger seats and

said, "it's three of them."  After a discussion about future
firearms transactions, the CS handed ARREOLA $460 for the
methamphetamine and said he did not have change. ARREOLA gave
the CS $9 back and said he owed him a dollar.  ARREOLA said he
would talk to the supplier in Riverside about possible firearms
that were available.  The CS mentioned meeting outside of the
"hood" and ARREOLA agreed, stating that the hood "was hot right
now."  ARREOLA then left in an unidentified vehicle.  The CS
returned to the debriefing location and turned in the
methamphetamine.

70.  The substance purchased from ARREOLA was later tested
and determined to be 83.1 grams of actual methamphetamine.

**J.   January 10, 2020 Purchase of Methamphetamine from GUERRERO**

71.  After obtaining GUERRERO's cell phone number during
the January 2, 2020 operation (714-357-3482), the CS and
GUERRERO began communicating with each regarding future drug and
firearms transactions.  On January 6, 2020, the CS called
GUERRERO and introduced himself as "Whooper's friend" (that is,
LOEZA's friend) from "the other day."  GUERRERO said he sold his
last firearm but the CS asked for some "material," specifically
"crystal," referring to methamphetamine.  GUERRERO said he had
some available and it would be $130 to $140 per ounce.

72.  On January 9, 2020, the CS called GUERRERO again and
told him that he needed "three" of the "clear," referring to
three ounces of methamphetamine.  GEURRERO told him it would be
"360" total for the three ounces.  On January 10, 2020, GUERRERO
and the CS spoke several times about where to meet, eventually

settling on the Home Depot parking lot on Brookhurst Street in Anaheim at 2 p.m.

73.  At 1:30 p.m. on January 10, 2020, the CS met with investigators to prepare for the undercover purchase from GUERRERO.  TFO Valdez gave the CS $860 to make the drug purchase and possibly purchase firearms at investigator's direction. Investigators searched the CS and his vehicle for possible contraband, with negative results, and provided the CS with an audio and video recording device.  The CS then drove to the Home Depot parking lot to meet GUERRERO.  At approximately 2:38 p.m., GUERRERO called the CS and said he was pulling into the parking lot.

74.  A black Infinity registered to GUERRERO at 205 South Walnut Street, Apartment C, Anaheim, California, then parked next to the CS' vehicle.  The CS got into the backseat of the Infinity and spoke to GUERRERO, who was in the driver's seat while his girlfriend, N.G., was in the passenger seat.  After a brief discussion about possible gun purchases, GUERRERO asked the CS if he still wanted three ounces and the CS said yes. GUERRERO picked up a red clear plastic sandwich bag from his lap and handed it to the CS.  The clear baggie contained a white crystal-like substance that appeared to be methamphetamine.  The CS confirmed the price was "360" and then handed GUERRERO $360, before leaving.

75.  Surveillance followed the Infiniti and observed GUERRERO drive to 205 South Walnut Street, Apartment C, in

Anaheim, the same address to which the black Infiniti was registered.

76.   The CS returned to the debriefing location and provided investigators with the methamphetamine.  The methamphetamine was later tested by the DEA Southwest Laboratory and determined to be 81.7 grams of actual methamphetamine.

**K.   January 16, 2020 Buy-Walk of Methamphetamine From GUERRERO**

77.   Following the January 10, 2020 transaction, the CS contacted GUERRERO on January 16, 2020 and asked for three more ounces of methamphetamine.  GUERRERO instructed the CS to call him when he arrived in the neighborhood that day.  After several more calls, GUERRERO and the CS agreed to meet at the Home Depot in Anaheim where they had previously met.

78.   At 4:30 p.m. on January 16, 2020, the CS met with investigators to prepare for the undercover purchase. Investigators gave the CS $1,500 to purchase the drugs and the CS left for the Home Depot parking lot.  At approximately 6:00 p.m., GUERRERO arrived driving the black Infinity from the previous transaction.  The CS entered GUERRERO's vehicle.  Once inside, the CS asked for the price of the three ounces and GUERRERO said "360."  The CS also asked about possible firearms for sale and GUERRERO said he did not have anything but he knew someone who had AR-15s and AK-47s for sale.  GUERRERO also mentioned a .40 caliber handgun with a 30-round clip that was available for $800 that he was considering buying himself. GUERRERO also stated he had .45, .22, and .38 caliber handguns for his personal use.

79.   GUERRERO then handed the CS a clear plastic baggie containing what appeared to be methamphetamine, in exchange for $360 dollars.  Before the CS left, GUERRERO asked if he was interested in purchasing any other type of narcotics such as Xanax, which the CS declined.  GUERRERO told the CS he could get him any other type of drug he needed.

80.   Following the transaction, the CS returned to the debriefing location and turned in the methamphetamine.  The methamphetamine was later tested by the DEA Southwest Laboratory and determined to be 81.4 grams of actual methamphetamine.

**L.   March 25, 2020 Purchase of Firearms from ARREOLA**

81.   Throughout mid-March, the CS and ARREOLA called and texted each other about the availability of weapons.  During the calls, ARREOLA sent multiple pictures of firearms for sale, to include pictures of several AK-47s and SKS rifles.  ARREOLA repeatedly stated that the weapons were "expensive" but they were selling fast.

82.   On March 23, 2020, ARREOLA called the CS and told him "there is one" that was a "big one" and that it was the one he "sent a picture of."  ARREOLA said there were "two more of those rifles" available and the supplier was asking "like $2,000 bucks."  ARREOLA told the CS that he would call the supplier right now and ask for pictures and see if the supplier was willing to negotiate.  About two hours later, ARREOLA sent two photographs to the CS, each containing a picture of a rifle. ARREOLA called back shortly after sending the text message and told the CS that a different rifle was available for $1,800 and

that he would obtain the price for the two he just sent the CS pictures of.  The CS said he would buy the one that was $1,800. The following day, March 24, 2020, ARREOLA called and said the price was lowered to $1,500.  During the call, ARREOLA and the CS decided to meet the following day, March 25, 2020, to conduct the transaction.

83.  On the day of the purchase, ARREOLA and the CS called to arrange the transaction.  The CS asked what the total was, and ARREOLA said it would be "5,550" for three rifles.  The CS asked ARREOLA "where are the straps? Do you have them there with you, dude?"  ARREOLA said, "I have them with me."

84.  At 1:15 p.m. on March 25, 2020, the CS met with investigators to purchase the rifles from ARREOLA. Investigators provided the CS with money and recording devices for the transaction, and the CS left for 1800 East Chelsea Drive in Anaheim.  Prior to the transaction, ARREOLA texted the CS this address and told the CS to meet him there.

85.  The CS parked at the address and called the CS once he arrived.  ARREOLA asked the CS what he was driving and the CS described his vehicle.  A short time later, a silver Toyota Prius parked behind the CS's vehicle.  ARREOLA exited from the front passenger seat of the Prius and approached the CS. ARREOLA told the CS to open the trunk.  The CS exited his vehicle and opened the trunk, at which time ARREOLA walked over to the Prius and took out a roll of artificial turf from the vehicle.  ARREOLA carried the roll of turf to the trunk of the CS's vehicle and told him that the three rifles were in there.

ARREOLA rolled open the turf and showed the three rifles to the CS.

86.   ARREOLA entered the CS's vehicle and the CS gave him $6,000 for the rifles.   ARREOLA said he would count the money later because he did not want to be there for too long.   ARREOLA then exited with the money.

87.   Following the transaction, the CS returned to the debriefing location and turned in the firearms and remaining money to TFO Valdez.

88.   On December 15, 2020, FBI firearms expert SA Trevor Twitchell examined the firearms purchased by the CS from ARREOLA.   SA Twitchell determined that the firearms consisted of the following:

      a.   a Cugir Arms Factory, model WASR 10, 7.62 caliber rifle, bearing serial number BP-0747-86, which had manufactured internationally;

      b.   a Zastava Arms, model AK-47, 7.62 caliber rifle, bearing serial number 001812, which had been manufactured internationally; and

      c.   a Norinco, model SKS, 7.62 caliber rifle, bearing serial number 21056398, which had been manufactured internationally.

**M.   ARREOLA, LOEZA, and GUERRERO's Criminal History**

89.   I have reviewed AREOLA's criminal history and learned that he has the following felony convictions, each punishable by a term of imprisonment exceeding one year:

a.   Possession for Sale of a Controlled Substance, in violation of California Health and Safety Code Section 11378, in the Superior Court of the State of California, County of Orange, case number 10NF2569, on or about September 22, 2010; and

b.   Receiving Stolen Property, in violation of California Penal Code Section 496(a), in the Superior Court of the State of California, County of Orange, case number 13NF2715, on or about November 13, 2013.

90.   I have reviewed LOEZA's criminal history and learned that he has the following felony convictions, each punishable by a term of imprisonment exceeding one year:

a.   Smuggling Controlled Substances into a Correctional Facility, in violation of California Penal Code Section 4573, in the Superior Court of the State of California, County of Orange, case number 17NF0579, on or about April 6, 2017; and

b.   Battery, Criminal Street Gang Activity, in violation of California Penal Code Section 186.22(d)-242, in the Superior Court of the State of California, County of Orange, case number 19NF2144, on or about August 30, 2019.

91.   I have reviewed GUERRERO's criminal history and learned that he has the following felony convictions, each punishable by a term of imprisonment exceeding one year:

a.   Possession of a Controlled Substance, in violation of California Health and Safety Code Section 11377(a), in the Superior Court for the State of California, County of Orange, case number 04CF2978, on or about October 28, 2004;

b.      Possession of a Narcotic Controlled Substance, in violation of California Health and Safety Code Section 11350(a), in the Superior Court for the State of California, County of Orange, case number 10HF1399, on or about April 1, 2011;

c.      Sale or Transportation of a Controlled Substance, in violation of California Health and Safety Code Section 11379(a), in the Superior Court for the State of California, County of Orange, case number 12CF3376, on or about April 9, 2013;

d.      Domestic Battery with Corporal Injury, in violation of California Penal Code Section 273.5(a), in the Superior Court for the State of California, County of Orange, case number 14HF1480, on or about August 12, 2014;

e.      Smuggling Controlled Substances into a Correctional Facility, in violation of California Penal Code Section 4573, in the Superior Court for the State of California, County of Orange, case number 16NF3136, on or about February 2, 2017;

f.      Possession of a Firearm by a Felon, in violation of California Penal Code Section 29800(a)(1), in the Superior Court for the State of California, County of Orange, case number 18CF2274, on or about May 17, 2019; and

g.      Evading while Driving Recklessly, in violation of California Vehicle Code Section 2800.2, in the Superior Court for the State of California, County of Orange, case number 18CF2274, on or about May 17, 2019.

## V.  <u>CONCLUSION</u>

92.  For all the reasons described above, there is probable cause to believe that ARREOLA, LOEZA and GUERRERO, have committed violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(viii), Distribution of Methamphetamine, and Title 18, United States Code, Section 922(g)(1), Felon in Possession of Firearms and Ammunition.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>10th</u> day of
January, 2022.

_____
UNITED STATES MAGISTRATE JUDGE